In re The TOPPS COMPANY
SHAREHOLDERS
LITIGATION

The Upper Deck Company and
Northwood Investors
LLC, Plaintiffs,

v.

The Topps Company, Inc., Arthur T.
Shorin, Jack H. Nusbaum, Allan A.
Feder, Stephen D. Greenberg, Ann
Kirschner, David M. Mauer, Richard
Tarlow, Madison Dearborn Partners
LLC, Madison Dearborn Capital Part-
ners V–A, L.P., Madison Dearborn
Capital Partners V Executive–A, L.,
The Tornante Company LLC, Tor-
nante–MDP Joe Holding LLC, and
Tornante–MDP Joe Acquisition Corp.,
Defendants.

C.A. Nos. 2786–VCS, 2998–VCS.

Court of Chancery of Delaware.

Submitted: June 11, 2007.
Decided: June 14, 2007.

Seth D. Rigrodsky, Esquire, Brian D. Long, Esquire, Rigrodsky & Long, P.A., Wilmington, Delaware, Executive Committee Co–Chairs for Plaintiffs.

Robert M. Kornreich, Esquire, Carl L. Stine, Esquire, Wolf Popper, LLP, New York, New York, Of Counsel for Executive Committee Co–Chair for Plaintiffs.

Joseph A. Rosenthal, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware, Liaison Counsel for Plaintiffs.

Bruce L. Silverstein, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for Plaintiffs The Upper Deck Company and Northwood Investors LLC.

Gregory P. Williams, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants The Topps Company, Inc., Arthur T. Shorin, Jack H. Nusbaum, Allan A. Feder, Stephen D. Greenberg, Ann Kirschner, David M. Mauer and Richard Tarlow.

Robert K. Payson, Esquire, Potter, Anderson & Corroon, LLP, Wilmington, Delaware, Attorneys for Defendants Madison Dearborn Partners LLC, Madison Dearborn Capital Partners V–A, L.P., Madison Dearborn Capital Partners V–C, L.P., The Tornante Company LLC, Tornante–MDP Joe Holding LLC and Tornante–MDP Joe Acquisition Corp.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

The Topps Company, Inc. is familiar to all sports-loving Americans. Topps makes baseball and other cards (think Pokemon), this is Topps's so-called "Entertainment Business." It also distributes Bazooka bubble gum and other old-style confections, this is Topps's "Confectionary Business." Arthur Shorin, the son of Joseph Shorin, one of the founders of Topps and the inspiration for "Bazooka Joe," is Topps's current Chairman and Chief Executive Officer. Shorin has served in those positions since 1980 and has worked for Topps for more than half a century, though he owns only about 7% of Topps's equity. Shorin's son-in-law, Scott Silverstein, is his second-in-command, serving as Topps's President and Chief Operating Officer.

Despite its household name, Topps is not a large public company. Its market capitalization is less than a half billion dollars and its financial performance has, as a general matter, flagged over the past five years.

In 2005, Topps was threatened with a proxy contest. It settled that dispute by a promise to explore strategic options, including a sale of its Confectionary Business. Topps tried to auction off its Confectionary Business, but a serious buyer never came forward. Insurgents re-emerged the next year, in a year when Shorin was among the three directors up for re-election to Topps's classified board. With the ballots about to be counted, and defeat a near certainty for the management nominees, Shorin cut a face-saving deal, which expanded the board to ten and involved his re-election along with the election of all of the insurgent nominees.

Before that happened, former Disney CEO and current private equity investor Michael Eisner had called Shorin and offered to be "helpful." Shorin understood Eisner to be proposing a going private transaction.

Once the insurgents were seated, an "Ad Hoc Committee" was formed of two insurgent directors and two "Incumbent Directors" to evaluate Topps's strategic direction. Almost immediately, the insurgent directors and the incumbent directors began to split on substantive and, it is fair to say, stylistic grounds. The insurgents then became "Dissident Directors."

In particular, the Ad Hoc Committee divided on the issue of whether and how Topps should be sold. The Dissident Directors waxed and waned on the advisability of a sale, but insisted that if a sale was to occur, it should involve a public auction process. The Incumbent Directors were also ambivalent about a sale, but were resistant to the idea that Topps should again begin an auction process, having already failed once in trying to auction its Confectionary Business.

From the time the insurgents were seated, Eisner was on the scene, expressing an interest in making a bid. Two other financial buyers also made a pass. But Topps's public message was that it was not for sale.

Eventually, the other bidders dropped out after making disappointingly low value expressions of interest. Eisner was told by a key Incumbent Director that the Incumbent Directors might embrace a bid of $10 per share. Eisner later bid $9.24 in a proposal that envisioned his retention of existing management, including Shorin's son-in-law. Eisner was willing to tolerate a post-signing Go Shop process, but not a pre-signing auction.

The Ad Hoc Committee split 2–2 over whether to negotiate with Eisner. Although offered the opportunity to participate in the negotiation process, the apparent leader of the Dissidents refused, favoring a public auction. One of the Incumbent Directors who was an independent director took up the negotiating oar, and reached agreement with Eisner on a merger at $9.75 per share. The "Merger Agreement" gave Topps the chance to shop the bid for 40 days after signing, and the right to accept a "Superior Proposal" after that, subject only to Eisner's receipt of a termination fee and his match right.

The Topps board approved the Merger Agreement in a divided vote, with the Incumbent Directors all favoring the Merger, and the Dissidents all dissenting. Because of the dysfunctional relations on the Ad Hoc Committee, that Committee was displaced from dealing with the Go Shop process by an Executive Committee comprised entirely of Incumbent Directors.

Shortly before the Merger Agreement was approved, Topps's chief competitor in the sports cards business, plaintiff The Upper Deck Company, expressed a willingness to make a bid. That likely came as no surprise to Topps since Upper Deck had indicated its interest in Topps nearly a year and half earlier. In fact, Upper Deck had expressed an unrequited ardor for a friendly deal with Topps since 1999, and Shorin knew that. But Topps signed the Merger Agreement with Eisner without responding to Upper Deck's overture. Shortly after the Merger was approved, Topps's investment banker began the Go Shop process, contacting more than 100 potential strategic and financial bidders, including Upper Deck, who was the only serious bidder to emerge.

Suffice it to say that Upper Deck did not move with the clarity and assiduousness one would ideally expect from a competitive rival seeking to make a topping bid. Suffice it also to say that Topps's own reaction to Upper Deck's interest was less than welcoming. Instead of an aggressive bidder and a hungry seller tangling in a diligent, expedited way over key due diligence and deal term issues, the story that emerges from the record is of a slow-moving bidder unwilling to acknowledge Topps's legitimate proprietary concerns about turning over sensitive information to its main competitor and a seller happy to have a bid from an industry rival go away, even if that bid promised the Topps's stockholders better value.

By the end of the Go Shop period, Upper Deck had expressed a willingness to pay $10.75 per share in a friendly merger, subject to its receipt of additional due diligence and other conditions. Although having the option freely to continue negotiations to induce an even more favorable topping bid by finding that Upper Deck's interest was likely to result in a Superior Proposal, the Topps board, with one Dissident Director dissenting, one abstaining, and one absent, voted not to make such a finding.

After the end of the Go Shop period, Upper Deck made another unsolicited overture, expressing a willingness to buy Topps for $10.75 without a financing contingency and with a strong come hell or high water promise to deal with manageable (indeed, mostly cosmetic) antitrust issues. The bid, however, limited Topps to a remedy for failing to close limited to a reverse break-up fee in the same amount ($12 million) Eisner secured as the only recourse against him. Without ever seriously articulating why Upper Deck's proposal for addressing the antitrust issue was inadequate and without proposing a specific higher reverse break-up fee, the Topps Incumbent Directors have thus far refused to treat Upper Deck as having presented a Superior Proposal, a prerequisite to putting the onus on Eisner to match that price or step aside.

In fact, Topps went public with a disclosure about Upper Deck's bid, but in a form that did not accurately represent that expression of interest and disparaged Upper Deck's seriousness. Topps did that knowing that it had required Upper Deck to agree to a contractual standstill (the "Standstill Agreement") prohibiting Upper Deck from making public any information about its discussions with Topps or proceeding with a tender offer for Topps shares without permission from the Topps board.

The Topps board has refused Upper Deck's request for relief from the Standstill Agreement in order to allow Upper Deck to make a tender offer and to tell its side of events. A vote on the Eisner Merger is scheduled to occur within a couple of weeks.

A group of "Stockholder Plaintiffs" and Upper Deck (collectively, the "moving parties") have moved for a preliminary injunction. They contend that the upcoming Merger vote will be tainted by Topps's failure to disclose material facts about the process that led to the Merger Agreement and about Topps's subsequent dealings with Upper Deck. Even more, they argue that Topps is denying its stockholders the chance to decide for themselves whether to forsake the lower-priced Eisner Merger in favor of the chance to accept a tender offer from Upper Deck at a higher price. Regardless of whether the Topps board prefers the Eisner Merger as lower risk, the moving parties contend that the principles animating *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*[1] prevent the board from denying the stockholders the chance to make a mature, uncoerced decision for themselves.

In this decision, I conclude that a preliminary injunction against the procession of the Eisner Merger vote should issue until such time as: (1) the Topps board discloses several material facts not contained in the corporation's "Proxy Statement," including facts regarding Eisner's assurances that he would retain existing management after the Merger; and (2) Upper Deck is released from the standstill for purposes of: (a) publicly commenting on its negotiations with Topps; and (b) making a non-coercive tender offer on conditions as favorable or more favorable than those it has offered to the Topps board.

The moving parties have established a reasonable probability of success that the Topps board is breaching its fiduciary duties by misusing the Standstill in order to prevent Upper Deck from communicating with the Topps stockholders and presenting a bid that the Topps stockholders could find materially more favorable than the Eisner Merger. Likewise, the moving parties have shown a likelihood of success on their claim that the Proxy Statement is materially misleading in its current form.

The injunction that issues is warranted to ensure that the Topps stockholders are not irreparably injured by the loss of an opportunity to make an informed decision and to avail themselves of a higher-priced offer that they might find more attractive.

## II. *A Reader's Roadmap To The Opinion*

The briefs of the Stockholder Plaintiffs and Upper Deck[2] advance arguments so numerous that it is realistically impossible for the court to address them all in the time frame in which a decision of this kind should issue; nor, frankly, do the briefs treat all these arguments in a substantive manner that comports with requirements for fair presentation. Given this reality, I focus my attention solely on the arguments that are substantial enough to possibly support the issuance of a preliminary injunction.

In examining those issues, I divide my consideration of the merits along a traditional dividing line, which separates my consideration of disclosure claims from my

---

1. 506 A.2d 173 (Del.1986).

2. Upper Deck's fellow plaintiff is its controlled affiliate, Northwood Investors LLC. Northwood is the acquisition vehicle Upper Deck is using. Although the defendants question Upper Deck's standing, Northwood is a Topps stockholder and entitled under *Revlon* and its progeny to press fiduciary duty claims.

*E.g., In re Gaylord Container Corp. S'holders Litig.,* 747 A.2d 71, 77–78 & n. 8 (Del.Ch. 1999) (explaining that a bidder who owns shares in a target has standing to press fiduciary duty claims against the target's board and collecting cases to that effect identifying the pragmatic reasons justifying such a policy).

resolution of claims premised on the defendants' compliance with their *Revlon* duties. The standards of review relevant to such claims are familiar and need not be dilated on at length.

When directors of a Delaware corporation seek approval for a merger, they have a duty to provide the stockholders with the material facts relevant to making an informed decision.[3] In that connection, the directors must also avoid making materially misleading disclosures, which tell a distorted rendition of events or obscure material facts.[4] In determining whether the directors have complied with their disclosure obligations, the court applies well-settled standards of materiality, familiar to practitioners of our law and federal securities law.[5]

The so-called *Revlon* standard is equally familiar. When directors propose to sell a company for cash or engage in a change of control transaction, they must take reasonable measures to ensure that the stockholders receive the highest value reasonably attainable.[6] Of particular pertinence to this case, when directors have made the decision to sell the company, any favoritism they display toward particular bidders must be justified solely by reference to the objective of maximizing the price the stockholders receive for their shares.[7] When directors bias the process against one bidder and toward another not in a reasoned effort to maximize advantage for the stockholders, but to tilt the process toward the bidder more likely to continue current management, they commit a breach of fiduciary duty.[8]

My recitation of the facts will come in five parts. First, I will set forth the key terms of the Eisner Merger Agreement, including the consideration Eisner proposes to pay, the post-signing shopping process permitted by the Merger Agreement, and the deal protection measures. Second, I will set forth the key terms of the Standstill Agreement signed by Upper Deck, explaining in the course of that what Upper Deck is, the negotiations leading to the Standstill Agreement, and some key points regarding the final form of that Agreement. Third, I will detail the course of events that led to the signing of the Eisner Merger Agreement and the current status quo, largely tracking the chronology and take on key events set forth in the Proxy Statement. Fourth, I will set forth those undisputed facts that I conclude are not contained in the Proxy Statement, and that the Stockholder Plaintiffs and Upper Deck contend are material and must be disclosed before the Merger vote. Finally, I set forth those areas where the Proxy Statement advances a position about factu-

---

3. *E.g., Arnold v. Society for Savings Bancorp., Inc.*, 650 A.2d 1270, 1277 (Del.1994).

4. *E.g., Emerald Partners v. Berlin*, 726 A.2d 1215, 1223 (Del.Supr.1999) ("When stockholder action is requested, directors are required to provide shareholders with all information that is material to the action being requested and to provide a balanced truthful account of all matters disclosed in the communication with shareholders.") (quotation omitted).

5. *See, e.g., Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1985) (explaining that in-

formation is material if "there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote") (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

6. *E.g., Revlon*, 506 A.2d at 184 n. 16; *accord Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 44 (Del.1994).

7. *QVC*, 637 A.2d at 49–50.

8. *E.g., Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1282–83 (Del.1989).

al issues about which there is a good faith basis for dispute.

The reason for this last category's inclusion largely relates to the Standstill Agreement. The Incumbent Directors who comprise the majority of the Topps board have disseminated proxy materials that characterize Upper Deck's conduct and its acquisition offers in a negative light. But the Topps board has refused to release Upper Deck from the Standstill Agreement in order to allow Upper Deck to put its contrary view of these matters before the Topps electorate.

After these sections, I will summarize the *Revlon* arguments made by the Stockholder Plaintiffs and Upper Deck. Many of those arguments will have been presaged by the previous discussion, but will be drawn together in, I hope, a more coherent fashion.

### III. *Factual Background*

#### A. *The Eisner Merger Agreement*

Eisner proposes to acquire Topps through a private equity firm he controls, The Tornante Company, LLC, in an alliance with another private equity group, Madison Dearborn Capital Partners, LLC. For simplicity's sake, I refer to Eisner and his private equity partners simply as "Eisner."

Eisner and Topps executed the Merger Agreement on March 5, 2007, under which Eisner will acquire Topps for $9.75 per share or a total purchase price of about $385 million. The Merger Agreement is not conditioned on Eisner's ability to finance the transaction, and contains a representation that Eisner has the ability to obtain such financing.[9] But the only reme-

dy against Eisner if he breaches his duties and fails to consummate the Merger is his responsibility to pay a $12 million reverse break-up fee.

The "Go Shop" provision in the Merger Agreement works like this. For a period of forty days after the execution of the Merger Agreement, Topps was authorized to solicit alternative bids and to freely discuss a potential transaction with any buyer that might come along. Upon the expiration of the "Go Shop Period," Topps was required to cease all talks with any potential bidders unless the bidder had already submitted a "Superior Proposal," or the Topps board determined that the bidder was an "Excluded Party," which was defined as a potential bidder that the board considered reasonably likely to make a Superior Proposal. If the bidder had submitted a Superior Proposal or was an Excluded Party, Topps was permitted to continue talks with them after the expiration of the Go Shop Period.

The Merger Agreement defined a Superior Proposal as a proposal to acquire at least 60% of Topps that would provide more value to Topps stockholders than the Eisner Merger. The method in which the 60% measure was to be calculated, however, is not precisely defined in the Merger Agreement, but was sought by Eisner in order to require any topping bidder to make an offer for all of Topps, not just one of its Businesses.

Topps was also permitted to consider unsolicited bids after the expiration of the 40–day Go Shop period if the unsolicited bid constituted a Superior Proposal or was reasonably likely to lead to one. Topps could terminate the Merger Agreement in order to accept a Superior Proposal, sub-

---

9. At the time that Eisner executed the Merger Agreement, Eisner also provided Topps with commitment letters from Tornante and Madison Dearborn regarding their equity in-

vestments in the acquisition and a separate commitment letter with respect to the debt financing for the acquisition.

ject only to Eisner's right to match any other offer to acquire Topps.

The Eisner Merger Agreement contains a two-tier termination fee provision. If Topps terminated the Eisner Merger Agreement in order to accept a Superior Proposal during the Go Shop Period, Eisner was entitled to an $8 million termination fee (plus a $3.5 million expense reimbursement), in total, or approximately 3.0% of the transaction value. If Topps terminates the Merger Agreement after the expiration of the Go Shop Period, Eisner is entitled to a $12 million termination fee (plus a $4.5 million expense reimbursement), or approximately 4.6% of the total deal value.

The Eisner Merger Agreement is subject to a number of closing conditions, such as consent to the transaction by regulatory authorities and the parties to certain of Topps's material contracts, such as its licenses with Major League Baseball and other sports leagues.

In connection with the Eisner Merger Agreement, Shorin and Eisner entered into a letter agreement pursuant to which Shorin agreed to retire within sixty days after the consummation of the Merger and to surrender $2.8 million to which he would otherwise be entitled under his existing employment agreement in the event of a change of control of Topps. Shorin would remain a consultant to Topps for several years with sizable benefits, consistent with his existing employment agreement.

### B. *The Standstill Agreement Signed By Upper Deck*

Upper Deck is currently the only company other than Topps to hold a license from Major League Baseball to sell baseball cards featuring the League's players. As such, Upper Deck is now Topps's primary, and only, competitor in the American baseball card industry. When Upper Deck sought access to confidential information about Topps's operations during the Go Shop process, Topps insisted, as it did with all other potential bidders, including Eisner, that Upper Deck sign a confidentiality agreement, containing a Standstill provision.

Topps sent Upper Deck a draft Standstill Agreement that contained the following material terms: (1) Topps would make available to Upper Deck certain information concerning the business, financial condition, operations, prospects, assets, and liabilities of Topps solely for the purpose of allowing Upper Deck to evaluate a possible transaction between Topps and itself; (2) Upper Deck agreed not to disclose the fact that such information was being provided to it or that it had entered into the Standstill Agreement, or make any public disclosure with respect to any proposed transaction between Upper Deck and Topps; and (3) Upper Deck agreed for a period of two years not to acquire or offer to acquire any of Topps's common stock by way of purchase in the open market, tender offer, or otherwise without Topps's consent, or to solicit proxies or seek to control Topps in any manner.

When Upper Deck received the draft Standstill Agreement, it attempted to make revisions before executing it. In particular, Upper Deck sought to eliminate the provision in the Standstill Agreement that prevented it from making a tender offer for Topps and sought to insert a provision into the Standstill Agreement requiring Topps to furnish to Upper Deck the same materials that it had given to Eisner and that it was giving to any other potential bidders. Topps refused both of these proposed revisions, citing concerns that Upper Deck might try to use the Go Shop process as a pretext for receiving access to sensitive competitive information about Topps's baseball card business.

On March 19, 2007, Upper Deck executed a Standstill Agreement that contained the same material terms that were included in the initial draft that was provided to it.

### C. *The Sale Process and Subsequent Negotiations As Explained In The Proxy Statement*

#### 1. *The Proxy Contests And The Unsuccessful Auction For The Confectionary Business*

Although Topps has had a storied history, and is a household name among American sports fans, both industries in which it operates have been steadily declining in the last decade and Topps's profitability has suffered. For a few years around the turn of the century, Topps's bottom line was boosted by the popularity of its Pokemon trading cards. The Pokemon boost was short lived, however, and in recent years, Topps's earnings per share have fallen from sixty cents a share in 2002 to less than a dime a share in 2006.

In 2004, Topps began a strategic review of its domestic operations in an attempt to reverse the downward trend. Topps concluded that its Confectionary Business in particular faced serious obstacles to achieving profitability in light of recent retail consolidation and increased competition in the industry.

As of 2005, Topps had a nine-member classified board of directors, three of whom were up for re-election at Topps's 2005 annual meeting. On April 25, 2005, Pembridge Capital Management, LLC, a small hedge fund that owned some of Topps's common stock, announced its intention to nominate its own slate of three director candidates and to solicit proxies for their election at the meeting. Pembridge withdrew its proxy solicitation, however, after receiving assurances that Topps would intensify its efforts in considering strategic alternatives for the company. Topps and Pembridge also entered into a letter agreement under which Pembridge agreed to terminate its proxy solicitation in exchange for an agreement from the Topps board not to adopt a poison pill before June 30, 2006 without stockholder approval.

At that point, Topps began to seriously consider selling the company. In light of the diverse nature of the Confectionary and Entertainment Businesses, and a supposed belief (says the Proxy Statement) that there was no logical buyer for the entire company, the Topps board decided to commence a sale process, in the form of an auction, for its Confectionary Business only. It hoped to realize $300 million from the sale and hired Lehman Brothers as its financial advisor. The auction did not go well, however, and Topps was disappointed with the response. Only two bidders emerged, and their offers were materially lower than the $300 million figure Topps was hoping for. After some initial due diligence, both bidders went away.

The Confectionary Business auction, however, sparked rumors among the investment community that Topps might consider other additional strategic alternatives. Upper Deck, through its financial advisor, CIBC World Markets Corp., contacted Lehman Brothers around this time frame to inquire whether Topps might consider a sale of its Entertainment Business to Upper Deck. The Proxy Statement makes a vague reference to this overture. Undisclosed in the Proxy Statement, though, was that Shorin had rebuffed several overtures over the years from Upper Deck broaching the idea of a friendly combination with Topps. According to Topps, discussions about a possible Upper Deck–Topps transaction in 2005 did not progress past the preliminary stage.

After the failed Confectionary Business auction, in April 2006, Pembridge began a second proxy contest. It nominated a slate of three directors and publicly stated that if its nominees were . elected, they would aggressively seek to sell the company in a going private transaction. One of the directors Pembridge sought to replace was Topps's chairman and CEO Arthur Shorin. Going into July 28, the date of the annual meeting, Shorin and his fellow nominees were facing certain defeat. A face-saving deal between Shorin and the insurgents was cut. At the meeting— which was delayed until August so the deal could be implemented—Topps expanded its board to ten members, to permit the seating of four directors, Shorin and Pembridge's three nominees, Arnaud Ajdler, Timothy Brog, and John Jones, who then became the group I have identified as the Dissident Directors. On August 25, 2006, the date of the rescheduled stockholders meeting, those four members were elected to the Topps board.[10]

The deal left a Topps board comprised of seven directors who had served Topps for many years (the "Incumbent Directors") and the three Dissident Directors. Five of the six non-management Incumbent Directors were independent directors under the NASDAQ's criteria. But all were close to Shorin. The other non-management director was Jack Nusbaum, who served not only as director but as lead outside counsel for Topps, through his law firm Wilkie Farr & Gallagher.

## 2. *The Eisner Negotiations*

The Proxy Statement indicates that during the second proxy contest, there was a general belief in the marketplace that Topps would "entertain" sales offers. The Proxy Statement does not disclose that Shorin sent out a different public message, issuing a letter in July 2006 stating that Topps was not interested in a sale "at this time" as a "quick fix." In any event in May and June 2006, Topps received unsolicited indications of interest in a potential transaction from two financial buyers at $9.00 to $9.75 per share and $9.50 to $10.00 per share, respectively. After a due diligence review, however, neither of those bidders made any serious offers to buy Topps, much less at those price levels.

In early June 2006, during the second proxy contest, Eisner contacted Shorin and mentioned that he had read about the proxy contest. He suggested that the two should meet. On June 12, 2006, Shorin and Silverstein met with Eisner and had a general discussion about the nature and status of Topps's business. At the end of the meeting, Eisner asked Shorin whether he could be "helpful" to Topps, and Shorin and Eisner agreed to stay in touch. Shorin understood Eisner to mean that he might propose a going private transaction.

Shortly after that meeting, Eisner contacted Shorin and indicated that he was interested in a potential transaction with Topps. Shorin directed Eisner to a long-

---

10. The Stockholder Plaintiffs contend that the Proxy Statement does not fairly convey the electoral pickle Shorin was in during July 2006. They say the Proxy Statement should have indicated that the votes were essentially counted, that the insurgents were going to win, and Shorin's slate, including Shorin himself, was going down to defeat. Not only that, the Stockholder Plaintiffs suggest that the Proxy Statement does not fairly indicate that Eisner had approached Shorin and Sil-

verstein and offered to be helpful once he heard about the second proxy fight. But the Proxy Statement fairly discloses all those facts and makes it plain that Eisner was a management-friendly bidder who used Shorin's perceived vulnerability as an opening to make a bid. Contrary to the Stockholder Plaintiffs, I think reasonable stockholders can come up with four when the equation 2 + 2 is written out for them in crayon.

time Topps independent director, Stephen Greenberg, to discuss any such transaction. Greenberg and Eisner were familiar with each other, and had previously had, according to the Proxy Statement, "limited business dealings." The specific nature of those dealings is that in 1997, Greenberg sold a business that he had founded, The Classic Sports Network, to ESPN, which was a subsidiary of the Walt Disney Company, of which Eisner was then CEO and Chairman. Greenberg remained employed by ESPN for about a year after the sale, during which time he had some discussions, and at least one lunch meeting, with Eisner. Eisner and Greenberg spoke briefly at an annual conference for Media executives hosted by Greenberg's new employer, Allen & Company, in Sun Valley, Idaho in July 2006. At that time, Greenberg told Eisner that, in light of the yet-unresolved proxy contest, Topps's board was not in a position to discuss a sale of the company. On August 3, 2006, after the proxy contest had been settled, Eisner telephoned Greenberg to inquire again about a potential transaction. Greenberg again told Eisner that such discussions would be premature and suggested that they revisit the matter after the upcoming Labor Day weekend. According to the proxy statement, Eisner and Greenberg began to talk again beginning on September 7.

Greenberg put off Eisner in large measure so that a new committee of the Topps board could first begin to operate. That committee directly resulted from the proxy contest settlement. As part of the settlement process, Topps formed an "Ad Hoc Committee" to explore and evaluate strategic alternatives for Topps. The Ad Hoc Committee consisted of Greenberg, another Incumbent Director, Allan Feder, and two of the Dissident Directors, Brog and Ajdler. Greenberg wanted the Ad Hoc Committee to get organized before getting into deep discussions with Eisner.

On September 29, Eisner telephoned Greenberg and the two had preliminary discussions about the price Eisner might pay in a potential transaction. Eisner explained that he was having difficulty justifying the payment of a premium over the trading price of Topps's common stock at the time, which was $8.96 per share. Greenberg indicated that that would not be an acceptable offer and Eisner inquired as to what would be an acceptable price. Greenberg responded that in his view, $10 per share would likely garner support among Topps's Incumbent Directors, but that Greenberg did not know what price would be acceptable to the newly-elected Dissident Directors. After this conversation, Eisner expanded his due diligence review of Topps in preparation for making a formal offer to acquire the company. Greenberg reported this conversation to the Ad Hoc Committee. Dissident Director Ajdler was upset that Greenberg mentioned a $10 per share price without Ad Hoc Committee approval. But he based his concern on the fact that a price that high might scare off Eisner, given that the two other parties who had considered an offer concluded Topps was not worth anywhere near that price level.

In addition to a potential sale of the company, the Ad Hoc Committee considered a number of potential uses for a substantial amount of cash that Topps had on hand (about $85 million), including a special dividend to stockholders and a stock buyback program. The Ad Hoc Committee met more than a dozen times in the last few months of 2006 primarily to discuss these options and a possible sale of the company. In the course of those meetings, the Ad Hoc committee interviewed a number of investment banks to serve as potential financial advisors, ulti-

mately deciding to retain Lehman Brothers, which had already been engaged as financial advisor to Topps.

On December 22, 2006, Eisner submitted a formal indication of interest to acquire Topps at a price of $9.24 per share, which represented a 5.7% premium over Topps's then-current trading price. The Topps board met to discuss Eisner's proposal on January 9. At that meeting, Brog and Ajdler, the two Dissident Directors on the Ad Hoc Committee, recommended rejection of Eisner's proposal and urged Topps to embark upon a public sale process in which Topps would be auctioned off to the highest bidder. Greenberg and Feder disapproved of a public auction process. They were skeptical that a public auction would yield a more attractive offer than that proposed by Eisner. They also explained that Eisner had indicated in no uncertain terms that he would withdraw his proposal and discontinue his efforts to acquire Topps if Topps commenced an auction. Greenberg and Feder also expressed concern about the effect of a failed auction on Topps, citing internal problems that had arisen as a result of the company's failed efforts a year earlier to auction off its Confectionary Business. At the end of the meeting, the Topps board declined to begin an auction process and authorized the Ad Hoc Committee to continue negotiations with Eisner.

Over the next several days, a number of offers and counteroffers were made. The Topps board met again on January 16, 2006, at which time Greenberg informed the board that Eisner was prepared to increase his offer to $9.75 per share, but not more, and that he was insisting on a 30–day exclusivity period in which to negotiate a definitive merger agreement. The board authorized the Ad Hoc Committee to continue to negotiate the general terms of such an agreement and an appropriate exclusivity period. After the meeting, a letter of intent was prepared agreeing to the 30–day exclusivity period and outlining the basic merger terms. The Ad Hoc Committee met on January 19 to vote on the proposal. The vote was 2–2 with Greenberg and Feder voting in favor and Brog and Ajdler, voting against. Because the Ad Hoc Committee was deadlocked, the matter was presented to the full board at a meeting on the following day. The board approved the proposal by a vote of 7–3 with all of the Dissident Directors voting against it.

On January 25, the Topps board met again to consider a valuation analysis presentation from Lehman Brothers. After that presentation, the Incumbent Directors resisted the Dissident Directors' request that negotiations with Eisner cease. The Incumbent Directors voted to continue negotiating with the goal of getting Eisner to increase the price of his bid. Because of the 2–2 deadlock on the Ad Hoc Committee, the Topps board had concerns about the Committee's ability to negotiate the terms of a definitive merger agreement and as a result dissolved the Committee. The board asked Greenberg to serve as lead director to negotiate with Eisner. Brog and Ajdler objected to this, suggesting that because of the prior business dealings between Greenberg and Eisner, Greenberg faced a conflict of interest that would prevent him from obtaining the best deal possible for the Topps stockholders. As a result of Brog and Ajdler's objections, Greenberg declined the request to serve as lead director. The board then asked Feder to serve in that role and Feder agreed to do so. In the last week of January, Topps and Eisner executed a letter of intent, providing for exclusivity through March 2, 2007, and the parties proceeded to negotiate the terms of a merger. Feder was unsuccessful in getting Eisner to move

on price and agreed to take a merger agreement with a $9.75 price to the board.

On March 3, 2007, Eisner delivered the executed definitive Merger Agreement to the Topps board. On March 5, 2007, after receiving an opinion from Lehman Brothers that the merger consideration was fair, the Topps board approved the Merger by 7–3 vote with the Dissident Directors again dissenting.

### 3. *The Go Shop Process And The Upper Deck Bid*

Based on the disapproval of the Eisner Merger by the Dissident Directors, a majority of Topps's board determined that the Dissidents could not adequately represent Topps's interests during the Go Shop Period and thus should not play a large role in the Go Shop process. The board therefore formed an Executive Committee for that purpose. The Executive Committee consisted of five Topps directors, including Topps's CEO and Chairman Shorin, as well as Greenberg and Feder, who had served on the now-defunct Ad Hoc Committee, and two other Incumbent Directors. The Executive Committee was charged with fulfilling all of the responsibilities of the Topps board, except with respect to deciding whether a competing offer would constitute a Superior Proposal or would be likely to lead to one. That responsibility remained with the entire board. Essentially, as Topps admits, the Dissident Directors were shut out of performing any board functions, except this one.

At the inception of the forty-day Go Shop Period, Lehman Brothers quickly contacted 107 potential strategic and financial bidders. Of those 107 potential bidders, five expressed interest in Topps and began a due diligence review. Four out of those five potential bidders, however, failed to make a serious offer to acquire Topps. The one potential bidder who did continue to seriously pursue an acquisition was Upper Deck.

Upper Deck's initial pursuit of a transaction with Topps went slowly and Upper Deck did not make a formal proposal until April 12, 2007, two days before the expiration of the Go Shop Period. Upper Deck's proposal was a non-binding indication of interest to acquire Topps for $10.75 in cash per share. Upper Deck provided Topps with a proposed merger agreement that was based on the Eisner Merger Agreement, but with the following proposed changes: (1) deletion of all representations and warranties related to Upper Deck's ability to finance the transaction; (2) deletion of a covenant that would require Upper Deck to divest itself of any and all assets in order to obtain approval of the transaction by antitrust or other regulators and the insertion of an affirmative right not to be required to divest itself of any assets in order to obtain regulatory approvals; (3) addition of a "due diligence out," under which Upper Deck would be entitled to any additional information about Topps that it might request and conditioning the deal on Upper Deck's satisfaction with its review of that information.

Allegedly, because Upper Deck is a private company and does not make public disclosures about its financial condition, Topps expressed concern about Upper Deck's ability to finance the transaction, especially in light of the proposed deletions of the representations about Upper Deck's ability to do so. According to the Proxy Statement, Topps was also concerned about Upper Deck's failure to assume the antitrust risks inherent in the transaction.

Upper Deck initially balked at providing Topps with its financial information and did not express a willingness to negotiate on this issue until less than two hours

before the expiration of the Go Shop period. Upper Deck proposed providing financial information to Lehman Brothers only, subject to a confidentiality agreement. But the Go Shop Period expired before a confidentiality agreement could be reached and before Upper Deck could provide any financial information to Lehman.

Two days after the Go Shop Period expired, on April 16, the Topps board met, with several members absent, to consider Upper Deck's proposal and to determine whether to treat it as an Excluded Party under the Eisner Merger Agreement, which would have allowed talks between Topps and Upper Deck to continue past the expiration of the Go Shop Period. By a vote of 5–1, the Topps board decided not to treat Upper Deck as an Excluded Party. The director who voted in favor of treating Upper Deck as an Excluded Party and continuing discussions with it was Ajdler. The other Dissident Director who was present—Brog—abstained from the vote.

The Proxy Statement gives three reasons why Topps declined to treat Upper Deck as an Excluded Party despite the fact that Upper Deck has expressed an interest in paying materially more for the company than Eisner: (1) Upper Deck's failure to provide evidence of its ability to finance the transaction despite Topps's repeated efforts to confirm its ability to do so during the final days of the Go Shop period; (2) the risk that the transaction could be delayed or prevented by antitrust authorities and Upper Deck's failure to

sufficiently assume that risk; and (3) the small ($12 million) reverse termination fee (essentially a cap on Upper Deck's liability to Topps in the event that Upper Deck breaches the merger agreement and fails to consummate the transaction) proposed by Upper Deck. With respect to this last point, Topps stated that although the $12 million cap on liability was customary and appropriate in a transaction with a financial buyer like Eisner,[11] it was insufficient in a transaction with a strategic buyer like Upper Deck, especially in light of the additional risks inherent in a transaction between two competitors, which is much more likely to face regulatory obstacles and because Upper Deck has not provided sufficient evidence of its ability to finance the deal.

The Topps Proxy Statement was filed on May 21, 2007. On May 24, 2007, Topps updated its Proxy Statement by disclosing that Upper Deck had just made a new, unsolicited proposal to acquire Topps for $10.75. That disclosure indicated that the terms of the new proposal differed somewhat from Upper Deck's initial proposal. It also indicated that Upper Deck's new proposal was accompanied by a letter from CIBC World Markets, Upper Deck's financial advisor and potential lender, which stated that CIBC was "highly confident" that it could deliver financing for the proposed Upper Deck–Topps transaction.

Topps again did not treat Upper Deck's proposal as a Superior Proposal under the Merger Agreement. Topps indicated in its public disclosure that there continued to

---

11. This rationale is worth noting. Apparently, financial buyers argue with a straight face that they should, because of reputational factors, be considered as presenting a lower risk of consummation for lack of financing than strategic buyers. Thus, in the past, financial buyers always argued for a financing out. Now, they say that they will agree to no out but only if their liability is capped at the amount of a reverse break-up fee. Meanwhile, strategic buyers continue to be asked to accept full liability for damages caused if they fail to close, even if the reason for not closing is based on financing, not a risk unique to a strategic buyer. This is an interesting asymmetry, and the factors driving it seem to include both economically rational ones and ones that are less rational.

be material outstanding issues associated with Upper Deck's offer, including Upper Deck's failure to show that there was committed financing for the transaction (in this regard, Topps referenced the conditional nature of CIBC's highly confident letter), Upper Deck's continued unwillingness to assume the risk associated with the necessary antitrust approval, and Upper Deck's continued insistence on limiting its liability to $12 million under any definitive agreement.

#### 4. *The Dissident Directors Publicly Denounce The Eisner Merger*

Following the execution of the Eisner Merger Agreement and the shutting out of the Dissident Directors, the Dissidents, especially Ajdler, have been quite vocal about their opposition to the Merger. Ajdler has formed an organization called "The Committee To Enhance Topps," and is actively soliciting proxies in opposition to the Eisner Merger.

Ajdler has also written a number of letters to the Topps board criticizing the Eisner Merger, the process leading up to it, and the manner in which Topps has dealt with Upper Deck. These letters have all been released to the press and are disclosed in Ajdler's competing proxy statement. Annex E to the Topps Proxy Statement contains some of these letters, which make clear that the Dissident Directors strongly oppose the Eisner Merger, have serious problems with the way it was negotiated, and were not given an opportunity to review or comment on the company's disclosures about it, including the Proxy Statement itself.

#### D. *The Undisputed Facts That Are Not In The Proxy Statement*

The narrative presented in the previous section largely tracks the description of the relevant facts provided to the Topps stockholders in the Proxy Statement. This rendition was fashioned by the Incumbent Directors without prior review by the Dissident Directors.

As a result, that description tells a one-sided story and omits—as any summary of events must—a number of facts. The Stockholder Plaintiffs and Upper Deck allege, however, that some of the omitted facts are clearly material and should have been included in the Proxy Statement. As urgently, Upper Deck contends that the Proxy Statement makes materially misleading representations of fact, which warrant correction. It would be impossible to rationally address all the problems with the Proxy Statement that Upper Deck and the Stockholder Plaintiffs claim to exist. Therefore, I ration my limited capacity for analysis by focusing on their major contentions, along subject matter lines that help relate these disclosure issues to the substantive *Revlon* concerns raised by this motion.

To avoid repetition later in the opinion, I will also note when I conclude that the moving parties have identified an omission or alleged misrepresentation of fact that rises to a material level. I also indicate when I believe that the moving parties have simply identified omitted facts that are either immaterial, or already disclosed in substance.

#### 1. *The Failure To Disclose Eisner's Assurances To Topps Management*

The Stockholder Plaintiffs and Upper Deck believe that the Incumbent Directors, prefer a deal with Eisner that will enable the company's current managers to continue in their positions. More pointedly, they suggest that the Incumbent Directors want to help Shorin preserve his influence over the business his family started by perpetuating Silverstein in office.

In this respect, the Stockholder Plaintiffs and Upper Deck contend that the Proxy Statement obscures the extent of Eisner's assurances that a result of that type will obtain if the Eisner Merger is consummated. To that point, they note that the Proxy Statement goes out of its way to stress that the Topps board "instructed the Company's management not to have any discussions with [Eisner] . . . [before a merger agreement was signed] regarding any employment arrangements following the consummation of a transaction." "Accordingly, no discussions regarding post-merger employment arrangements took place . . . prior to the execution of the merger agreement."

■ But that is true only in a misleadingly literal sense. The Proxy Statement does not disclose that both in Eisner's first indication of interest submitted on December 22, 2006 at $9.24 per share and his subsequent proposal at $9.75 per share, Eisner explicitly stated that his proposal was "designed to" retain "substantially all of [Topps's] existing senior management and key employees."

Nor does the Proxy Statement disclose that Eisner had continually communicated that intention and his high regard for Topps management to Feder and Greenberg during the course of the Merger Agreement negotiations. In fact, it is undisputed that before the signing of the Merger Agreement, Feder set up a conference call between Eisner, on the one side, and key Topps executives, including Silverstein, on the other. The purpose of that call was specifically to give Eisner the opportunity to personally reiterate the assurances about management's likely future that he had conveyed to Feder.

To be direct, the Proxy Statement should have disclosed these facts. As it currently stands, the Proxy Statement creates a misleading impression that Topps managers have been given no assurances about their future by Eisner.[12] In reality, Eisner has premised his bid all along as one that is friendly to management and that depends on their retention.

2. *The Proxy Statement's Failure To Disclose A Lehman Brothers's Valuation Presentation That Casts Doubt On The Fairness Of The Merger*

The Proxy Statement has a detailed description of the financial analyses that Lehman Brothers undertook in connection with advising Topps. The Stockholder Plaintiffs raise several points about the valuation disclosure. But one point is a substantial one.

In the Proxy Statement, two sets of financial projections are disclosed along with the results of discounted cash flow analyses Lehman performed using those projections. The Proxy Statement indicates that the DCF values were calculated on March 1, 2007, in connection with Lehman's ultimate fairness presentation. The Proxy Statement suggests that one of those sets of projections was a very aggressive, very optimistic set, developed primarily as a selling tool. Contrary to the Stockholder Plaintiffs' arguments, that is a fair suggestion borne out by the record. The other set of financial projections, however, was prepared to be a more conservative, realistic projection of what Topps could achieve. That set also projected improved performance but at more modest levels than the selling projections.

The Proxy Statement discloses that Lehman calculated a value range of $10.31

---

**12.** By contrast, the Proxy Statement fairly discloses the agreement Shorin negotiated with Eisner over his own future.

to $12.57 per share for the aggressive case, which Lehman deemed the "management case." For the more conservative case, which Lehman deemed the "adjusted case," the range was $8.76 to $10.16 per share. This range, which was based on more realistic assumptions, but ones that Lehman still deemed "rather aggressive," indicated that Eisner was offering a very attractive price.

The problem that the Stockholder Plaintiffs point out is that on January 25, 2007, a mere month or so beforehand, Lehman had made a detailed presentation to the Topps board containing similar analyses. In that analysis, the DCF range using the aggressive case, which that presentation candidly identified as the "Aggressive Case," came out at $10.64 to $12.99 per share. More problematically, the more realistic case, which that presentation candidly labeled the "Moderate Case," produced a DCF range of $9.67 to $10.66 per share.

On January 25, the Dissident Directors had expressed objections over continuing negotiations with Eisner. The Incumbent Directors overrode those objections, says the Proxy Statement, because they "had the goal of increasing the price beyond $9.75 if possible." It was only after this that Topps agreed to an exclusivity period with Eisner. During that period, Feder was charged with negotiating, and the Proxy Statement says he twice tried without success to get, a price increase. By the end of February, it was clear that Eisner would not pay more and that the Board would have to accept or reject $9.75 per share, based on input from Lehman.

Although the March 1 Lehman materials indicate that Topps management had re-

vised both the Moderate (a.k.a., Adjusted) and Aggressive (a.k.a., Management) forecasts downward, those revisions were relatively modest. What was not modest were changes that Lehman itself made. In the January 25 presentation, Lehman used a cost of capital between 11 % and 12% to perform its Moderate Case DCF. It premised that range on the reasonable basis that Topps's actual cost of capital was then 11.6%. But in the March 1 presentation, Lehman used a range of 11.5% to 13.5% to perform the same analysis, driving down the value range. Notably, the March 1 presentation still calculated Topps's actual cost of capital at 11.6%. But rather than using that as a rough mid-point, Lehman decided to make it essentially the low end of its discount rate range. Similarly, Lehman's March 1 presentation used a higher cost of capital for the Aggressive Case than it had used on January 25.

At oral argument, counsel for Topps explained another change that Lehman made that is, if true, difficult to fathom as the product of rational thinking. According to counsel, Lehman will not base a fairness opinion on projections that have not been prepared entirely by management. In the January 25 case, Lehman used the full five years of projections—the same projections disclosed in the Proxy Statement—and calculated a terminal value at the end of that period, using exit multiples for that last purpose.[13] In the March 1 presentation, Lehman truncated its DCF analysis to only use three years of the projections, and then used exit multiples to come up with a terminal value. Counsel for Topps implied that Lehman's policy was designed to ensure that management's projections and not its own drove the DCF analysis.

13. The projections underlying Lehman's January 25 cases were to a large extent disclosed in the Proxy Statement and oddly coupled with disclosure of Lehman's March 1 value ranges, which used modestly different projections. Thus, the Proxy Statement seems to contain a mismatch.

Of course, this method—which puts even more weight on the terminal value calculation—does not rationally achieve that objective. The terminal value calculation embeds hugely important subjective judgments about the corporation's future, including its likely future cash flows. Notably in this regard, Lehman accompanied its truncation of the period for which there were specific annual projections with a reduction in the range of exit multiples it used. On January 25, Lehman used an exit multiple range of 9.0 to 10.0. On March 1, Lehman used a range of 8.5 to 10.0. As with the discount rate change, Lehman also made this change to its Aggressive Case analysis. Interestingly, shortening the projection period from five to three years somehow led Lehman to use a lower rather than higher range of exit multiples.

As anyone who performs valuations knows, raising discount rates and lowering terminal multiples drives down the resulting value range. Subjective judgments like these are, of course, not scientific, but highly-paid valuation advisors should be able to rationally explain them. In this case, one can accept the decrease that came from management changes that made the projections more realistic based on more current information; indeed, the very modest nature of those changes—reducing expected compound annual sales growth in the Moderate Case from 5.8% to 5.6%, and in the Aggressive Case from 9.3% to 9.0%—inspires some confidence. What is not at all clear is why these modest changes were accompanied by major shifts in Lehman's analytical approach.

Candidly, the defendants have not made any confidence-inspiring explanations for Lehman's analytical changes. The record reflects what Dissident Director Ajdler feared—that Lehman would manipulate its analyses to try to make the Eisner offer look more attractive once it was clear Eisner would not budge on price. He sent an e-mail to Greenberg to that effect, and Greenberg's response seemed to agree that was a possibility.

In finding that the Proxy Statement does not fairly address this issue, I do not and need not make any finding that there was a purposeful intent on Lehman's part to generate a range of value that eased its ability to issue a fairness opinion. What I do find is that there is no evidence that the prior January 25 Moderate Case DCF analysis—which was based on five years of projections (and therefore involved less emphasis on a single terminal value estimate) and used a cost of capital that was rationally explained—was no longer reliable. That analysis cast the price Eisner was offering to pay in a quite different light than that which Lehman performed on March 1.

The January 25 presentation cannot be slighted as a selling document. This court is aware that one of the tasks of a diligent sell-side advisor is to present a responsibly aggressive set of future assumptions to buyers, in order to extract high bids. Here, though, the Moderate Case was not shared with bidders and there is no evidence that the January 25 presentation of that Case was intended as anything other than a responsible and genuine attempt at valuing Topps's future cash flows.

Given the major subjective changes that Lehman made that were not explained, given that those changes made the Eisner bid look much more attractive, and given that those changes were made only after Feder's attempts to negotiate a price higher than $9.75 had finally failed, the Proxy Statement is materially misleading for failing to discuss the advice given to the

Board about valuation on January 25.[14]

### 3. Alleged Omissions And Material Misstatements Of Fact Bearing On Upper Deck's Credibility As A Bidder

The other major category of disclosure claims essentially focuses on whether the Proxy Statement accurately discloses the undisputed facts regarding Upper Deck's interest in acquiring Topps.

Upper Deck argues, with some fairness, that the Proxy Statement makes a sustained attempt to demonstrate that Upper Deck does not have a genuinely serious interest in acquiring Topps, suggesting by implication that Upper Deck may simply want to gain a competitive advantage by learning Topps confidential information, or upsetting an attractive bid by Eisner and leaving a weakened Topps vulnerable, reeling from the turmoil of a failed sale process. Some of Upper Deck's more debatable points will be discussed in the next section.

For now, I concentrate on those of Upper Deck's arguments that involve facts that the defendants cannot actually dispute.

I begin with Upper Deck's contentions regarding the fact that the Proxy Statement states that that during the second proxy contest, there was a general belief in the marketplace that Topps may be "willing to entertain acquisition proposals." The intended implication of that statement is, of course, that all potential buyers knew that Topps's would entertain unsolicited offers and that any serious acquisition candidate would thus be likely to make one. As noted, however, the Proxy Statement fails to disclose that on July 24, 2006, after having received two unsolicited offers and after having preliminary discussions with Eisner, Shorin, in connection with the second proxy contest, wrote a letter informing the market that a "quick fix" sale of Topps was not in the interests of Topps's stockholders and would not be considered by the Topps's board—i.e., that Topps was not for sale. The plaintiffs contend that although Topps may secretly have been willing to entertain unsolicited bids, Shorin discouraged bids by making that statement. They say that a reasonable Topps stockholder should therefore be reminded of that, given the spin Topps is putting on events. I agree, and find that the Proxy Statement is materially misleading by failing to disclose Shorin's potentially bid-deterring statements to the market. Under Delaware law, when directors undertake to tell a story they must do it in a non-misleading manner.[15]

The next point of contention actually involves the question of which side made the first move toward a possible Topps–Upper Deck deal in 2007. The Proxy Statement implies that Topps made contacting Upper Deck one of its first priorities once the Go Shop Period commenced. What the Proxy Statement omits to mention is that Upper Deck sent an expression of interest to Topps, through a letter to one of the Dissident Directors, before the Go Shop Period began. Because the Proxy Statement intentionally casts a negative light on Upper Deck's sincerity as a bidder, the true chronology ought to be disclosed. Like my decision as to Shorin's July, 2006 letter, this decision is heavily influenced by the tendentious recitation of

---

14. *See, e.g., In re Pure Resources, Inc. S'holders Litig.,* 808 A.2d 421, 448 (Del.Ch.2002) (explaining that when a disclosure "venture[s] into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts").

15. *Malone v. Brincat,* 722 A.2d 5, 12 (Del. 1998); *In re Pure Resources, Inc. S'holders Litig.,* 808 A.2d 421, 448 (Del.Ch.2002).

events currently contained in the Proxy Statement.

Much more substantial are Upper Deck's arguments that the Proxy Statement and other public statements of Topps have misrepresented the two acquisition overtures Upper Deck has made to buy Topps following the execution of the Eisner Merger Agreement. As explained, Topps has publicly disclosed that it rejected Upper Deck's bid because of Upper Deck's failure to provide a firm debt financing commitment. The Proxy Statement fails to disclose, however, that Upper Deck's bid was not subject to a financing contingency. That is, Upper Deck was willing to enter into a merger agreement with Topps that would not let Upper Deck entirely off the hook in the event that it could not arrange financing. In that event, Upper Deck would be liable to Topps for the full amount of the $12 million reverse break-up fee that Upper Deck has proposed. That is the same remedy available to Topps if Eisner breaches. Topps did not make that clear. That was materially misleading. So was the failure to disclose the lack of a financing contingency.

Moreover, Upper Deck has now presented Topps with a letter from CIBC World Markets, a commercial lender, stating that CIBC is "highly confident" that it will be able to provide financing. Although Topps decries the contingent nature of that letter, it also does not explain that many of the conditions described in the letter relate to CIBC's desire to examine information that Topps was, at the time, refusing to provide to Upper Deck, or even CIBC (which promised not to share the information with Upper Deck).

Topps's Proxy Statement also cites antitrust concerns and Upper Deck's "unwillingness to sufficiently assume the risk associated with a failure to obtain the necessary antitrust approval." The Proxy Statement does not disclose, however, that in Upper Deck's revised unsolicited bid that it submitted after the close of the Go Shop Period, Upper Deck agreed to a strong "hell or high water" antitrust provision in which Upper Deck agreed to divest itself of any and all assets necessary to obtain regulatory approval. That is, if the antitrust regulators, or Major League Baseball for that matter, object to Upper Deck holding the only two existing licenses to print baseball cards, Upper Deck will divest itself of one of them. The only thing Upper Deck is unwilling to divest is its intellectual property, such as the Topps or Upper Deck name. Despite having every urgent reason to do so, Topps has identified no colorable argument as to why Upper Deck would or should be asked to do that. And Topps does not even fairly represent the substantial hell or high water provision offered by Upper Deck. In that respect, Topps also failed to disclose that Upper Deck presented Topps with an opinion from a reputable antitrust expert opining that there was no material antitrust risk.[16]

Topps never responded substantively during the negotiation—or the litigation—process to explain its antitrust concerns. That is perhaps understandable. Fifty years ago, Topps bought its only competitor in the sports cards industry. Later, in the 1960s and again in the 1970s—when it was much harder to be an antitrust defendant—Topps was twice sued on antitrust grounds. It won both cases and was not required to divest any of its assets.[17] In

---

**16.** *See* Affidavit of Randall J. Sunshine, Ex. K.

**17.** *See Fleer Corporation v. Topps Chewing Gum, Inc.,* 658 F.2d 139 (3d Cir.1981).

its papers and at oral argument, Topps could not rationally explain how Major League Baseball (an ironic antitrust plaintiff if ever there were one!) or anyone else could say that Upper Deck would have an illegal monopoly position if it acquired Topps. Upper Deck has agreed to divest one of the licenses if necessary and Major League Baseball is free to license another card manufacturer at any time. Based on that fact, Upper Deck's antitrust expert opined, uncontradicted by Topps, that a Topps–Upper Deck merger would be approved by the federal antitrust regulators without so much as a second request for additional information.[18] One would expect in high-stakes litigation like this that a well-heeled defendant like Topps would be able to present *some* credible expert evidence to support its antitrust views, if those views were in fact supportable. The fact that Topps has not is telling.

The fact that Upper Deck would own both its own name and the Topps brand would no more give it a monopoly on trading cards than would a merger of McDonald's and Burger King constitute a hamburger monopoly simply because the combined enterprise owned both the Whopper and Big Mac names. As a matter of fair disclosure, it seems required for Topps to admit that it was the winning party in the leading cases that Upper Deck would cite if antitrust authorities questioned its acquisition of Topps. In that same regard, the Proxy Statement is critical of Upper Deck for not providing adequate assurances about antitrust risk. But the Proxy Statement does not explain that Upper Deck cannot even begin the Hart–Scott–Rodino clearance process because of the Standstill Agreement. That raises as a final matter the failure of Topps to disclose that the terms of the Standstill Agreement prevent Upper Deck

from making a tender offer to Topps stockholders or from even responding to Topps's public statements about the negotiations between the two rivals or the nature of Upper Deck's bid.

### E. *Who's Telling The Truth?: The Parties' Debate About How Things Actually Went Down*

In the preceding section, I described the disclosure arguments of the moving parties that were based on matters generally not in dispute. Most of the remaining disclosure arguments of the Stockholder Plaintiffs and Upper Deck fall into a different category. These are arguments premised on the notion that Proxy Statement has told only one version of a disputed version of events.

For their part, the Stockholder Plaintiffs mostly point to the numerous disagreements Dissident Director Ajdler has with the Proxy Statement's rendition of key events. In that regard, the Stockholder Plaintiffs dilate on the Proxy Statement's failure to disclose just how close Greenberg's relationship was with Eisner. They say that the Proxy Statement should have disclosed that on at least one occasion, Greenberg asked Ajdler not to participate in a phone call with Eisner because that would "change the dynamic of the call." Likewise, the Stockholder Plaintiffs claim that the Proxy Statement's indication that Greenberg had had limited business dealings with Eisner understated their prior relationship.

The record reveals that this issue, like most of the Stockholder Plaintiffs' contentions, is not properly raised as a disclosure issue. On this record, Ajdler's version of events is no more credible on these points than Greenberg's. Indeed, if I had to choose, I would tend to find Ajdler's insin-

18. Sunshine Aff. Ex. K.

uation that Greenberg was in Eisner's pocket unfounded. Even if Greenberg asked Ajdler not to be on a call with Eisner for the reasons expressed, that would not mean Greenberg was in cahoots with Eisner. It could simply mean that Eisner knew who Greenberg was, respected his bona fides, and would feel freer to communicate solely with someone with whom he had some experience than with a stranger.

The Greenberg issue is useful, though, because it illustrates a point distinct from the issues I am about to discuss. Ajdler is soliciting proxies against the Merger. He has been telling his version of events, ensuring that the Topps stockholders hear his version and that of the other Dissident Directors about a variety of issues, such as the dissolution of the Ad Hoc Committee and the exclusion of the Dissident Directors from the committee addressing the Go Shop Process and Upper Deck's bid. The Stockholder Plaintiffs condemn those actions as conflicted and opportunistic corporate governance maneuvers. The defendants respond by pointing out that before Greenberg declined the invitation to serve as lead director, he asked Ajdler to assist him in that function and Ajdler declined. Feder reiterated that request after he was named lead director. The defendants say Ajdler, however, refused, but felt free to pester Feder and the other directors who were actively involved in the negotiations with a series of nuisance emails about the negotiations. Ajdler also questioned whether it was advisable for Topps to use management's traditional law firm, Wilkie Farr, to give the legal advice during the sales process, especially since Wilkie Farr's chairman served on the Topps board.

The stockholders can hear out both sides on these issues, and there is no need to force Topps to disclose a version of events that they contend never happened.

The same, however, is not true about the matters of contention between the Topps Incumbent Directors and Upper Deck. Topps and Upper Deck also have many disagreements about the true course of events, but only Topps has been able to tell its story to the Topps stockholders.

For example, as indicated previously, the Proxy Statement notes that Lehman had advised Topps in 2005 that because of the divergent nature of Topps's Entertainment and Confectionary Businesses, there was no "logical strategic buyer for the company." But Upper Deck claims that it had indicated its interest in acquiring Topps on several occasions before Topps entered into negotiations with Eisner. And in fact, Topps does not dispute that Upper Deck has made overtures about acquiring Topps in the past. In fact, Topps has submitted communications between Topps and Upper Deck dating from the 1998–2000 era, in which Upper Deck stated that it wanted to buy Topps in a friendly deal. Upper Deck contends that it reiterated that desire in both 2003 and 2004, as well as in 2005. Topps denies that Upper Deck contacted it in 2003 and 2004.

Topps and Upper Deck agree that in 2005, around the time Topps was shopping its Confectionary Business, Upper Deck contacted Lehman Brothers and expressed an interest in acquiring either the Entertainment Business or the entire company. The parties quibble, however, over the nature and timing of the discussions that followed. Topps contends that after Upper Deck's initial overture, its interest in a transaction waned and that both Upper Deck, and CIBC, Upper Deck's financial advisor, failed to return Lehman's phone calls. Upper Deck contends that Upper Deck actually made a preliminary offer to acquire all of Topps for $11 a share, but

gave up on pursuing a transaction after Topps informed CIBC that it would not entertain an offer from Upper Deck for either the Entertainment Business or the entire company, citing, among other things, antitrust concerns. The Proxy Statement discloses only Topps's version of events.

Likewise, Upper Deck believes that the Proxy Statement misrepresents the dynamics of the negotiations between Upper Deck and Topps during the Go Shop Period. The parties agree that Upper Deck made the first overture to Topps on February 20, 2007, about two weeks before Topps signed the Merger Agreement with Eisner. In that letter, Upper Deck expressed a desire to buy "all or part of the 'entertainment assets' of Topps." The letter was sent from Upper Deck's accounting firm to Dissident Director Brog. Because Brog was on vacation at the time and away from his office, he did not receive the letter until about a week later, yet before the Merger Agreement with Eisner was signed. Nonetheless, Topps opted to sign that Merger Agreement before talking to Upper Deck. This move was supported by Brog, who suggested that Topps contact Upper Deck "after we announce the transaction with [Eisner] (during the go-shop)."

Topps contends that Lehman Brothers called Upper Deck's CEO Richard McWilliam on March 6, the first day of the Go Shop Period. According to McWilliam, neither he nor his assistant heard from Lehman. McWilliam claims that they could not possibly have received any such call because they were away at a conference in Las Vegas. According to Upper Deck, discussions between the two rivals did not begin until Upper Deck's financial advisor, CIBC, made another unsolicited call to Lehman a few days after the start of the Go Shop Period.

Upper Deck also denies Topps's contention that Upper Deck was slow in its due diligence review of Topps and in formulating its $10.75 offer. Although Upper Deck did not submit its offer until two days before the close of the Go Shop, Upper Deck contends that Topps is at fault for any delay because it continually withheld information from Upper Deck that Upper Deck needed in order to make an accurate determination both of Topps's stand-alone value, as well as the value of any potential synergies that might flow from a Topps–Upper Deck combination. According to Upper Deck, Topps initially placed only a skeletal amount of information in the virtual data room that Upper Deck was using to conduct due diligence. Then, after Upper Deck complained, Topps flooded the room with large amounts of irrelevant information.

Topps has reasonable responses, pointing out that it gave Upper Deck the same information it gave to every other bidder with respect to the Confectionary Business. Moreover, with respect to the Entertainment Business, although Topps withheld some information regarding product-by-product profitability and the details of its license agreements with Major League Baseball and other sports leagues, Topps gave Upper Deck higher level data that should have been sufficient for Upper Deck, given that Upper Deck is highly knowledgeable about the sports cards industry. To that point, Topps claims that it would have been unreasonable for Upper Deck to have expected Topps to divulge its most sensitive information to its chief competitor without a more definitive commitment to purchase.

This sort of "he said, she said" stuff between a bidder and a target cannot be rationally sorted out by a court in a preliminary injunction proceeding so as to permit the formulation of a judicial order

requiring the target to disclose the bidder's preferred version of events. In the usual circumstances, that does not have a materially adverse effect on stockholders, because the bidder can tell its side of events and the stockholders therefore have an opportunity to make their own judgment about who is right.[19] But in this case, the Topps Incumbent Directors have refused to release Upper Deck from the Standstill, even for the limited purpose of communicating with the Topps stockholders.

## IV. *The Essence of The Revlon Claims*

The *Revlon* arguments advanced by the Stockholder Plaintiffs and Upper Deck differ a bit in their focus. I begin with the Stockholder Plaintiffs' *Revlon* arguments, which are premised on the notion that the Incumbent Directors who constitute a majority of the Topps board have been motivated by a desire to ensure that Topps remains under the control of someone friendly to the Shorin family and who will continue Shorin family members in the top leadership position. Since Shorin was forced into a face-saving settlement adding the Dissidents to the board, Shorin has known that time was running out on him. Therefore, he was motivated to find a buyer who was friendly to him and would guarantee that Shorin and Silverstein, his son-in-law, would continue to play leading roles at Topps. If Shorin didn't strike a deal to that effect before the 2007 annual meeting, he faced the prospect of having a new board majority oust him and his son-in-law from their managerial positions, and being relegated to a mere 7% stockholder

of the company his father and uncles started, and that he has personally managed as CEO for more than a quarter century. According to the Stockholder Plaintiffs, Eisner was the answer to Shorin's dilemma, as he promised to be "helpful" by taking Topps private and retaining Silverstein as CEO.

To the supposed end of helping Shorin meet his personal objectives, the Topps board majority resisted the Dissidents' desire for a public auction of Topps, and signed up a deal with Eisner without any effort to shop the company beforehand. Not only that, the Stockholder Plaintiffs contend that defendant Greenberg capped the price that could be extracted from Eisner by making an ill-advised and unauthorized decision to mention to Eisner that a $10 per share bid was likely to command the support of the non-Dissident directors.

The Stockholder Plaintiffs also complain that the deal protection measures in the Merger Agreement precluded any effective post-signing market check. Although the Stockholder Plaintiffs admit the Merger Agreement contained a Go Shop provision allowing Topps to shop the company for forty days, the Stockholder Plaintiffs contend that that time period was too short and that the break-up fee and match right provided to Eisner were, in combination, too bid-chilling. Therefore, although Topps approached over 100 financial and strategic bidders to solicit their interest, the Stockholder Plaintiffs say that effort was bound to fail from the get-go, especially given the market's justifiable suspicions

19. *See, e.g., Zaucha v. Brody,* 1997 WL 305841, at *5 (Del.Ch.1997) ("Assuming that one party's disclosures are not adequate, the court will consider the information provided by the opposing party in determining whether to set a contested solicitation aside.") *(aff'd* 697 A.2d 749 (Del.1997)); *see also Spielman v. Gen. Host Corp.,* 402 F.Supp. 190, 194–95 (S.D.N.Y.1975) ("[T]he fact that there is a contest for control means that a failure to present information may be rendered harmless by disclosure from others, such as the target company, the competing tenderor or outside sources."), *aff'd* 538 F.2d 39 (2d Cir. 1976).

that Shorin and the board majority wanted to do a deal with Eisner to preserve the Shorin family's managerial influence.

It is at this stage that the arguments of the Stockholder Plaintiffs and Upper Deck intersect. Although Upper Deck does not stress the failure of Topps to seek out a bid from it before signing up a deal with Eisner, it does contend that the Topps board's lack of responsiveness to its expression of interest in presenting a bid at $10.75 per share evidences the entrenchment motivations highlighted by the Stockholder Plaintiffs.

Upper Deck contends that the Topps board unjustifiably delayed its access to, and the scope of, due diligence materials. Upper Deck argues that the Topps board manufactured pretextual excuses not to decide before the end of the Go Shop Period that Upper Deck had presented a proposal reasonably likely to result in a Superior Proposal. By that decision, the Topps board gave up its ability freely to continue discussions with Upper Deck.

When Upper Deck refused to lose heart and continued to press ahead by making a formal unsolicited bid at $10.75 per share, Upper Deck says it met with further resistance, in the form of withheld due diligence and unsubstantiated concerns about Upper Deck's ability and commitment to closing a deal. Finally, Upper Deck found itself publicly criticized by the Topps board for having failed to act as a diligent, serious bidder.

When it met those obstacles, Upper Deck asked to be released from the Standstill so that it could: (1) present a tender offer directly to the Topps stockholders; and (2) present its own version of events to the Topps stockholders to correct the misstatements allegedly made by Topps about Upper Deck. But Topps refused, despite its undisputed right under the Eisner Merger Agreement to grant such a relief if the board believed its fiduciary duties so required.

According to Upper Deck (and the Stockholder Plaintiffs), by this pattern of behavior, the Topps board majority has clearly abandoned any pretense of trying to secure the highest price reasonably available. Instead of using the Standstill Agreement for a proper value-maximizing purpose, the Topps board majority is using that Agreement to leave the Topps stockholders with only one viable alternative, Eisner's bid, based on a skewed informational base. Unless injunctive relief issues to prevent the Merger vote, Upper Deck (and the Stockholder Plaintiffs) contend that the Topps stockholders face irreparable injury because they will vote on the Merger in ignorance of Upper Deck's version of events and, even more important, without the chance to accept a tender offer from Upper Deck at a price higher than Eisner's offer.[20]

These are in essence, the key *Revlon* arguments made by the Stockholder Plaintiffs and Upper Deck in support of their application for a preliminary injunction.

**20.** Consistent with its *Revlon* argument, Upper Deck also contends that Topps has itself violated the Standstill Agreement. By falsely disparaging Upper Deck's conduct and bid in public, Topps allegedly breached an implied covenant of good faith and fair dealing in that Agreement, a material breach that has the effect of releasing Upper Deck from the Standstill. Similarly, the clear premise of the Standstill Agreement was that Upper Deck would, in exchange for agreeing to the Standstill, be treated with good faith by Topps in the due diligence and bidding process. Because Topps's behavior supposedly evidences pervasive bad faith toward Upper Deck, Upper Deck contends that behavior constitutes another example of a prior material breach, relieving it of its obligations under the Standstill.

## V. Resolution Of The Revlon Claims And Decision On The Scope Of The Injunction

Upper Deck and the Stockholder Plaintiffs have moved for a preliminary injunction seeking to (1) stop the shareholder vote on the Eisner Merger; (2) require Topps to correct material misstatements in the Proxy Statement; and (3) prevent Topps from using the Standstill Agreement to preclude Upper Deck from publicly discussing its bid for Topps or from making a non-coercive tender offer directly to the Topps stockholders. In the previous sections, I addressed the moving parties' disclosure claims and identified the additional and corrective disclosures that are required before the Eisner Merger vote may proceed. The only task remaining therefore is to determine whether the moving parties' *Revlon* claims warrant the broader injunctive relief sought.

■ The legal standard governing the resolution of that question is well settled. In order to warrant injunctive relief, the moving parties must prove that (1) they are likely to succeed on the merits of their *Revlon* claims; (2) they will suffer imminent irreparable harm if an injunction is not granted; and (3) the balance of the equities weighs in favor of issuing the injunction.[21] I turn to those issues now, dividing the analysis in two parts. First, I address the decisions of the Topps board leading up to the signing of the Merger Agreement with Eisner. I then turn to the Topps board's dealings with Upper Deck after the Merger Agreement was executed.

■ The Stockholder Plaintiffs have largely taken the lead on the first time period. They argue that the Incumbent Directors unreasonably resisted the desire of the Dissident Directors to conduct a full auction before signing the Merger Agreement, that Greenberg capped the price Eisner could be asked to pay by mentioning that a $10 per share price would likely command support from the Incumbent Directors, that the Incumbent Directors unfairly restricted the Dissident Director's ability to participate in the Merger negotiation and consideration process, and that the Incumbent Directors foreclosed a reasonable possibility of obtaining a better bid during the Go Shop Period by restricting that time period and granting Eisner excessive deal protections. For its part, Upper Deck echoes these arguments, and supplements them with a contention that Upper Deck had made its desire to make a bid known in 2005, before Eisner ever made a formal bid, and was turned away.

Although these arguments are not without color, they are not vibrant enough to convince me that they would sustain a finding of breach of fiduciary duty after trial. A close reading of the record reveals that a spirited debate occurred between the two members of the Ad Hoc Committee who were Incumbent Directors, Greenberg and Feder, and the two who were Dissident Directors, Ajdler and Brog. After examining the record, I am not at all convinced that Greenberg and Feder were wrong to resist the Dissidents' demand for a full auction. Topps had run an auction for its Confectionary Business in 2005, without success.

The market knew that Topps, which had no poison pill in place, had compromised a proxy fight in 2006, with the insurgents clearly prevailing. Thus, although Shorin had put out a letter before the settlement of the proxy fight indicating that a "quick fix" sale was not in the interests of stockholders, the pot was stirred and ravenous capitalists should have been able to smell

---

21. *E.g., Revlon*, 506 A.2d at 179.

the possibility of a deal. Certainly that was true of Upper Deck, which is Topps's primary competitor. Now, of course, Upper Deck says that its overtures were rebuffed by Lehman, Topps's banker, a year earlier. But one must assume that Upper Deck is run by adults. As Topps's leading competitor, it knew the stress the Dissident Directors would be exerting on Shorin to increase shareholder value. If Upper Deck wanted to make a strong move at that time, it could have contacted Shorin directly (e.g., the trite lunch at the Four Seasons), written a bear hug letter, or made some other serious expression of interest, as it had several years earlier.[22] The fact that it did not, inclines me toward the view that the defendants are likely correct in arguing that Upper Deck was focused on acquiring and then digesting another company, Fleer, during 2005 and 2006, and therefore did not make an aggressive run at (a clearly reluctant) Topps in those years.[23]

Given these circumstances, the belief of the Incumbent Directors on the Ad Hoc Committee, and the full board, that another failed auction could damage Topps, strikes me, on this record, as a reasonable one.

In coming to that conclusion, I am also influenced by the fluctuating views of Dissident Director Ajdler, who is repeatedly quoted by the Stockholder Plaintiffs. When their moving papers were filed, they argued that Greenberg had breached his fiduciary duties by mentioning a supposedly low ball $10 per share price to Eisner without board authority, and therefore alleviating any incentive on Eisner's part to offer more. As it turns out, Ajdler was critical of Greenberg's move, not because $10 was too low, but because he feared that mentioning that price would scare Eisner away. Ajdler harbored that concern because two other bidders who had looked closely at Topps had withdrawn expressions of interest in buying at much lower prices. There is therefore nothing to this argument. Furthermore, I cannot find that Greenberg's move was unreasonable or poorly motivated. The price he mentioned was a substantial one, and Greenberg actually used the divide on the Topps board in order to suggest to Eisner he needed to get north of $10. Greenberg told Eisner that $10 would likely command the support of the Incumbents but that he did not know if it would satisfy the Dissidents. This sort of communication can be read as suggesting to Eisner that he ought to bid higher so as to gain the consensus support of the Topps board. At some point in the sales dance, someone has to make a move toward specificity. I am unpersuaded that after trial I would find Greenberg's to have been unreasonable.

Likewise, I am not convinced that the Incumbent Directors treated the Dissident Directors in a manner that adversely affected the ability of the board to obtain the highest value. The Dissident Directors were full of ideas—ideas that diverged widely. Their views of Topps's value do not suggest that the Topps board's approach was off the mark. One estimate of Ajdler's was that Topps would fetch $9.50 to $10.50 per share in an open auction. Indeed, that estimate was based on optimistic projections of Topps's future cash flows.

Greenberg and Feder heard Ajdler out about all his ideas. Although they at times expressed impatience with Ajdler and Brog, that impatience was understand-

22. *See* Declaration of Andrew Gasper (June 12, 2007), Ex. A.

23. *See* Affidavit of Christopher E. Morris (June 8, 2007) at ¶¶ 3–4; Affidavit of Christopher E. Morris (June 13, 2007) at ¶¶ 2–3.

able given the frequency, tenor, and shifting nature of the input received. To that point, I note that Greenberg stepped aside when the Dissident Directors claimed that his prior relationships with Eisner tainted him as a negotiator. Those prior relationships do not strike me as substantial enough to have compromised Greenberg's ability to do that task with fidelity and skill, but to have been substantial enough to have been useful in giving Greenberg credibility with Eisner and knowledge of Eisner that might have helped Topps get a better deal. But Greenberg did not press the point in deference to the Dissidents' wishes. When Feder stepped in, he specifically asked Ajdler to participate in the negotiations. Ajdler refused and then acted as a backseat driver by carping at Feder through e-mails.

In the end, I perceive no unreasonable flaw in the approach that the Topps board took to negotiating the Merger Agreement with Eisner. I see no evidence that another bidder who expressed a serious interest to get in the game during 2006 was fended off. There is no suggestion by even the Stockholder Plaintiffs that the two other private equity firms who discussed making a bid with Topps were inappropriately treated.

Most important, I do not believe that the substantive terms of the Merger Agreement suggest an unreasonable approach to value maximization. The Topps board did not accept Eisner's $9.24 bid. They got him up to $9.75 per share—not their desired goal but a respectable price, especially given Topps's actual earnings history and the precarious nature of its business.

Critical, of course, to my determination is that the Topps board recognized that they had not done a pre-signing market check. Therefore, they secured a 40–day

Go Shop Period and the right to continue discussions with any bidder arising during that time who was deemed by the board likely to make a Superior Proposal. Furthermore, the advantage given to Eisner over later arriving bidders is difficult to see as unreasonable. He was given a match right, a useful deal protection for him, but one that has frequently been overcome in other real-world situations.[24] Likewise, the termination fee and expense reimbursement he was to receive if Topps terminated and accepted another deal—an eventuality more likely to occur after the Go Shop Period expired than during it— was around 4.3% of the total deal value. Although this is a bit high in percentage terms, it includes Eisner's expenses, and therefore can be explained by the relatively small size of the deal. At 42 cents a share, the termination fee (including expenses) is not of the magnitude that I believe was likely to have deterred a bidder with an interest in materially outbidding Eisner. In fact, Upper Deck's expression of interest seems to prove that point—the termination fee is not even one of the factors it stresses.

Although a target might desire a longer Go Shop Period or a lower break fee, the deal protections the Topps board agreed to in the Merger Agreement seem to have left reasonable room for an effective post-signing market check. For 40 days, the Topps board could shop like Paris Hilton. Even after the Go Shop Period expired, the Topps board could entertain an unsolicited bid, and, subject to Eisner's match right, accept a Superior Proposal. The 40-day Go Shop Period and this later right work together, as they allowed interested bidders to talk to Topps and obtain information during the Go Shop Period with the

24. *See, e.g., Ace Ltd. v. Capital Re Corp.,* 747 A.2d 95 (Del.Ch.1999) (topping bid made by alternative buyer despite substantial termination fee and match right).

knowledge that if they needed more time to decide whether to make a bid, they could lob in an unsolicited Superior Proposal after the Period expired and resume the process.

In finding that this approach to value maximization was likely a reasonable one, I also take into account the potential utility of having the proverbial bird in hand. Although it is true that having signed up with Eisner at $9.75 likely prevented Topps from securing another deal at $10, the $9.75 bird in hand might be thought useful in creating circumstances where other bidders would feel more comfortable paying something like Upper Deck now says it is willing to bid. Because a credible buying group—comprised not only of Eisner, an experienced buyer of businesses for Disney, but also the experienced private equity firm, Madison Dearborn—had promised to pay $9.75, other bidders could take some confidence in that and have some form of "sucker's insurance" for considering a bid higher than that. Human beings, for better or worse, like cover. We tend to feel better about being wrong, if we can say others made the same mistake. Stated more positively, recognizing our own limitations, we often, quite rationally, take comfort when someone whose acumen and judgment we respect validates our inclinations. A credible, committed first buyer serves that role.

In this regard, Topps's decision to enter into the Merger Agreement with Eisner despite its having received an unsolicited indication of interest from Upper Deck a few days before the signing was also likely not an unreasonable one. This is perhaps a closer call, but the suggestion of Dissident Director Brog to respond to Upper Deck only after inking the Eisner deal bolsters this conclusion. Although the facts on this point are less than clear, as discussed, Topps appears to have had ra-

tional reason to be suspicious of Upper Deck's sincerity. Upper Deck had made proposals before, but had often appeared flaky. Moreover, Upper Deck was only expressing an interest in the Entertainment Business, not the whole company at that point. A sale of the Entertainment Business would have left Topps with a floundering Confectionary Business that it had already tried to sell once, without success. Signing up a sure thing with Eisner forced Upper Deck to get serious about the whole company, and set a price floor that Upper Deck knew it had to beat by a material amount.

■ For all these reasons, I cannot buttress the issuance of an injunction on the alleged unreasonableness of the Topps's board decision to sign up the Merger Agreement. I now turn to the more troubling claims raised, which are about the board's conduct after the Merger Agreement was consummated.

The parties have presented competing versions of the events surrounding Topps's discussions with Upper Deck during the Go Shop Period, beginning with a fight over who was the first to contact the other and when the parties began discussing the Standstill Agreement, which was not executed until the start of the third week of the Go Shop Period. Neither party emerges from these arguments in an entirely positive light. Regardless of whose version of events is correct, the Topps board was hardly as receptive as one would expect in a situation where it received an unsolicited overture from a competitor who had long expressed interest in buying Topps in a friendly deal and who, given the likely synergies involved in a combination of the two businesses, might, if serious about doing a deal, be able to pay a materially higher price than a financial buyer like Eisner. And when Upper Deck actually suggested a price materially

higher than Eisner, the Topps Incumbent Directors controlling the process did not evince enthusiasm about the possibilities for the stockholders; rather, they seemed more bent on coming up with obstacles to securing that higher value. This regrettably suggests that the Topps Incumbent Directors favored Eisner, who they perceived as a friendly suitor who had pledged to retain management and would continue Shorin and his family in an influential role.

At the same time, Upper Deck hardly moved with the speed expected of an interested buyer that has a limited time in which to secure a deal. Rather, Upper Deck initially acted in a manner that created rational questions about its seriousness and whether it was simply looking to poke around in Topps's files. To that point, Upper Deck failed to acknowledge Topps's legitimate concerns about entering into serious discussions with its only baseball card competitor. Upper Deck overreached when it asked for a provision in the Standstill Agreement obligating Topps to turn over to it the same information it provided to Eisner and the other bidders. Upper Deck was not the same as the other bidders and Topps had good reason to be skeptical of Upper Deck's intentions.

Topps had to balance its concerns about the possibility that Upper Deck might use the Go Shop process as a pretext for gaining access to Topps's proprietary information with the possibility that Upper Deck might be willing to make higher bid than Eisner.[25] There is a colorable argument that in the weeks that followed, Topps did not balance those concerns properly and rather relied on Upper Deck's status as a competitor as a pretext to keep Upper Deck at bay in order to preserve its friendly deal with Eisner. At the same time, Upper Deck's contention that it was delayed in submitting an actual bid for Topps by due diligence gamesmanship is undermined by the fact that Upper Deck claims (hotly disputed by Topps) to have made a blind, unsolicited bid for Topps at $11 a share in 2005. If it was able to make a blind bid then, why not in 2007?

In any event, I need not obsess over the behavior of the parties during the Go Shop Period. Upper Deck did finally make a formal bid for Topps at $10.75 per share two days before the close of the Go Shop. The Topps board had a fiduciary obligation to consider that bid in good faith and to determine whether it was a Superior Proposal or reasonably likely to lead to one. That is especially the case because the

**25.** In this same vein, Topps's primary contractual arguments, which are based on the express, and allegedly implied, terms of the Standstill Agreement do not have a reasonable likelihood of success. Upper Deck contends that it entered into the Standstill Agreement based on the understanding that Topps would provide it with whatever information it needed to formulate a bid and that it would turn over the same information it gave to Eisner and others. Upper Deck contends that Topps breached the Standstill Agreement by failing to do so. Clearly, however, Upper Deck had no such belief because it asked for an express contractual provision to that effect and was denied. Upper Deck's more colorable contract claim is that Topps's breached the Standstill Agreement by publicly discuss-ing—and disparaging—Upper Deck's bid. Upper Deck contends that, as a result, it should be excused from performance under the Standstill Agreement in order to respond to the misstatements made by Topps. Admittedly, the literal terms of the Standstill Agreement would not support an express breach of contract claim on this theory. Upper Deck may, however, have a viable claim for breach of the implied covenant of good faith and fair dealing in the Standstill Agreement. Because I conclude that the Topps board cannot, consistent with it fiduciary duties, exercise its contractual rights to prevent Upper Deck from responding to Topps's disclosures or from allowing it to take a non-coercive tender offer directly to Topps's stockholders, I need not resolve that contractual question.

Topps board was duty bound to pursue the highest price reasonably attainable, given that they were recommending that the stockholders sell their shares to Eisner for cash.[26]

Because of the final-hour nature of the bid, the Topps board had to determine whether to treat Upper Deck as an Excluded Party under the Merger Agreement so that it could continue negotiations with it after the close of the Go Shop Period. The Topps board's decision not to do so strikes me as highly questionable. In reaching that conclusion, I recognize that Topps had legitimate concerns about Upper Deck's bid. Although there was no financing contingency in the proposal, Topps had reason for concern because Upper Deck has proposed to limit its liability under its proposed deal to $12 million in the event it was not able to close the transaction. Underlying Topps's skepticism of the seriousness of Upper Deck's proposal was perhaps the suspicion that Upper Deck was willing to pay $12 million simply to blow up Topps's deal with Eisner. Topps had to consider the possibility that Upper Deck was afraid that Eisner, by leveraging his reputation in the entertainment community, might be able to turn Topps into a stronger competitor than it had previously been.

Moreover, Upper Deck's initial proposal arguably did not address Topps's concerns that Upper Deck's proposal raised antitrust concerns. In its initial unsolicited overture to Topps before the Eisner deal was signed, Upper Deck acknowledged that there might be some antitrust issues associated with a merger of the two firms. Yet, in its initial bid, Upper Deck proposed placing virtually all of the antitrust risk on Topps. True, Topps had been down this road itself before, and won, but the lack of any more substantial antitrust assurance

in Upper Deck's initial bid arguably gave Upper Deck too easy an out in the event that regulators raised even a minor objection because of the optics of the transaction.

That said, Upper Deck was offering a substantially higher price, and rather than responding to Upper Deck's proposal by raising these legitimate concerns, the Topps board chose to tie its hands by failing to declare Upper Deck an Excluded Party in a situation where it would have cost Topps nothing to do so. Eisner would have had no contractual basis to complain about a Topps board decision to treat Upper Deck as an Excluded Party in light of Upper Deck's 10% higher bid price.

Upper Deck's first bid may not have been a Superior Proposal. But Topps had no reason to believe that the terms of Upper Deck's bid were non-negotiable, and it would have been reasonable for the Topps directors to have believed that their financing and antitrust concerns were manageable ones that could and, indeed, should have been capable of reasonable resolution in subsequent negotiating rounds. Topps could have gone back to Upper Deck with a proposal to increase the reverse termination fee and could have proposed a reasonable provision to deal with the antitrust concerns. By declaring Upper Deck an Excluded Party, the Topps board would have preserved maximum flexibility to negotiate freely with Upper Deck. The downside of such a declaration is hard to perceive.

The only advantage I can perceive from the decision not to continue talking with Upper Deck was if that decision was intended to signal Topps's insistence on a better bid that satisfied its concerns. But the behavior of the Topps's Incumbent Di-

---

26. *Revlon*, 506 A.2d at 184 n. 16; *QVC*, 637 A.2d at 34.

rectors and their advisors, as revealed in this record, does not suggest such a motivation. The decision of Brog to abstain from the vote on that issue is an oddment, I admit, which lends support to the decision, but is consistent with the Dissident Directors' enigmatic behavior and possibly a refusal by Brog to vote on the issue, given his exclusion from the sale process. The reason I remain troubled by the decision is that the behavior of the Topps Incumbent Directors after this point inspires no confidence that their prior actions were motivated by a desire to advance the interests of Topps stockholders.

Upper Deck came back a month later with an improved unsolicited bid. That bid again offered a price materially higher than Eisner's: $10.75 per share. That bid also was, again, not any more financially contingent than Eisner's bid; there was no financial contingency, but Topps's remedy was limited to a $12 million reverse break-up fee. This time, to address Topps's antitrust concerns, Upper Deck offered a strong "come hell or high water" provision offering to divest key licenses if required by antitrust regulators, as well as an opinion by a respected antitrust expert addressing Topps's still unspecified antitrust concerns.

Although the Topps Incumbent Directors did obtain a waiver from Eisner to enter discussions with Upper Deck about this bid, they did not pursue the potential for higher value with the diligence and genuineness expected of directors seeking to get the best value for stockholders. Topps made no reasonable counter-offer on the antitrust issue and failed to identify why the transaction proposed a genuine antitrust concern. Instead, Topps insisted that Upper Deck agree to accept any condition, however extreme, proposed by antitrust regulators, and Topps never acknowledged its own past antitrust victories. Although Topps felt free to negotiate price with Eisner when he was promising to pay a materially lower price, cap his liability at $12 million, and condition his deal on approval by Topps licensors (which Upper Deck did not), it never made reasonable suggestions to Upper Deck about a higher reverse break-up fee, antitrust issues, or price. Furthermore, although it did a deal with Eisner with only very limited remedial recourse if he breached, largely one senses, because of the reputational damage Eisner would suffer if he failed to close, the Topps board never seems to have taken into account the reputational damage Upper Deck would suffer if it did the same, despite its knowledge that Upper Deck has acquired other businesses in the past (remember Fleer?) and may therefore wish to continue to do so.

This behavior is consistent with a record that indicates that Shorin was never enthusiastic about the idea of having his family company end up in the hands of an upstart rival. That possible motivation is one that I do not approach in the same reductivist manner as the moving parties. Quite frankly, neither of the moving parties has made the case that Shorin and Silverstein are not skilled, competent, hard-working executives. More important, it is often the case that founders (and sons of founders) believe that their businesses stand for something more than their stock price. Founders therefore often care how their family legacy—in the form of a corporate culture that treats workers and consumers well, or a commitment to product quality—will fare if the corporation is placed under new stewardship.[27]

---

**27.** *Cf. Paramount Communications, Inc. v. Time, Inc.,* 1989 WL 79880, at *7 (Del.Ch. 1989) ("There may be at work here a force more subtle than a desire to maintain a title

The record before me clearly evidences Shorin's diffidence toward Upper Deck and his comparatively much greater enthusiasm for doing a deal with Eisner. Eisner's deal is premised on continuity of management and involvement of the Shorin family in the firm's business going forward. Upper Deck is in the same business line and does not need Shorin or his top managers.

Although Shorin and the other defendants claim that they truly desire to get the highest value and want nothing more than to get a topping bid from Upper Deck that they can accept, their behavior belies those protestations. In reaching that conclusion, I rely not only on the defendants' apparent failure to undertake diligent good faith efforts at bargaining with Upper Deck, I also rely on the misrepresentations of fact about Upper Deck's offer that are contained in Topps's public statements.

This raises the related issue of how the defendants have used the Standstill. Standstills serve legitimate purposes. When a corporation is running a sale process, it is responsible, if not mandated, for the board to ensure that confidential information is not misused by bidders and advisors whose interests are not aligned with the corporation, to establish rules of the game that promote an orderly auction, and to give the corporation leverage to extract concessions from the parties who seek to make a bid.[28]

But standstills are also subject to abuse. Parties like Eisner often, as was done here, insist on a standstill as a deal protection. Furthermore, a standstill can be used by a target improperly to favor one bidder over another, not for reasons consistent with stockholder interest, but because managers prefer one bidder for their own motives.

In this case, the Topps board reserved the right to waive the Standstill if its fiduciary duties required. That was an important thing to do, given that there was no shopping process before signing with Eisner.

The fiduciary out here also highlights a reality. Although the Standstill is a contract, the Topps board is bound to use its contractual power under that contract only for proper purposes. On this record, I am convinced that Upper Deck has shown a reasonable probability of success on its claim that the Topps board is misusing the Standstill. As I have indicated, I cannot read the record as indicating that the Topps board is using the Standstill to extract reasonable concessions from Upper Deck in order to unlock higher value. The Topps board's negotiating posture and factual misrepresentations are more redolent of pretext, than of a sincere desire to comply with their *Revlon* duties.

Frustrated with its attempt to negotiate with Topps, Upper Deck asked for a release from the Standstill to make a tender

---

or office in order to assure continued salary or prerequisites. Many people commit a huge portion of their lives to a single large-scale business organization. They derive their identity in part from that organization and feel that they contribute to the identity of the firm. The mission of the firm is not seen by those involved with it as wholly economic, nor the continued existence of its distinctive identity as a matter of indifference."), *aff'd,* 571 A.2d 1140 (Del.1989).

**28.** Contemplate, for example, a final round auction involving three credible, but now tired bidders, who emerged from a broad market canvass. One can easily imagine how a board striving in good faith to extract the last dollar they could for their stockholders might promise the three remaining bidders that the top bidder at 8:00 p.m. on the next Friday will get very strong deal protections including a promise from the target not to waive the Standstill as to the losers.

offer on the terms it offered to Topps and to communicate with Topps's stockholders. The Topps board refused. That refusal not only keeps the stockholders from having the chance to accept a potentially more attractive higher priced deal, it keeps them in the dark about Upper Deck's version of important events, and it keeps Upper Deck from obtaining antitrust clearance, because it cannot begin the process without either a signed merger agreement or a formal tender offer.

 Because the Topps board is recommending that the stockholders cash out, its decision to foreclose its stockholders from receiving an offer from Upper Deck seems likely, after trial, to be found a breach of fiduciary duty. If Upper Deck makes a tender at $10.75 per share on the conditions it has outlined, the Topps stockholders will still be free to reject that offer if the Topps board convinces them it is too conditional. Indeed, Upper Deck is not even asking for some sort of prior restraint preventing the Topps board from implementing a rights plan in the event of a tender offer (although Upper Deck has indicated that will begin round two of this litigation if Topps does). What Upper Deck is asking for is release from the prior restraint on it, a prior restraint that prevents Topps's stockholders from choosing another higher-priced deal. Given that the Topps board has decided to sell the company, and is not using the Standstill Agreement for any apparent legitimate purpose, its refusal to release Upper Deck justifies an injunction. Otherwise, the

Topps stockholders may be foreclosed from ever considering Upper Deck's offer, a result that, under our precedent, threatens irreparable injury.[29]

Similarly, Topps went public with statements disparaging Upper Deck's bid and its seriousness but continues to use the Standstill to prevent Upper Deck from telling its own side of the story. The Topps board seeks to have the Topps stockholders accept Eisner's bid without hearing the full story. That is not a proper use of a standstill by a fiduciary given the circumstances presented here. Rather, it threatens the Topps stockholders with making an important decision on an uninformed basis, a threat that justifies injunctive relief.[30]

As this reasoning recognizes, one danger of an injunction based on the Topps board's refusal to waive the Standstill is that it will reduce the board's leverage to bargain with Upper Deck. Because this record suggests no genuine desire by the board to use the Standstill for that purpose, that danger is minimal. To address it, however, the injunction I will issue will not allow Upper Deck to go backwards as it were. The Merger vote will be enjoined until after Topps has granted Upper Deck a waiver of the Standstill to: (1) make an all shares, non-coercive tender offer of $10.75 cash or more per share, on conditions as to financing and antitrust no less favorable to Topps than contained in Upper Deck's most recent offer; and (2) communicate with Topps stockholders about

**29.** *E.g., MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.,* 501 A.2d 1239, 1251 (Del.Ch. 1985), *aff'd,* 506 A.2d 173 (Del.1986).

**30.** *See, e.g., Louisiana Municipal Police Employees' Retirement System v. Crawford,* 918 A.2d 1172, 1192 (Del.Ch.2007) ("Shareholders would suffer irreparable harm [if they] were . . . forced to vote without knowledge of . . . material facts."); *ODS Technologies, L.P.*

*v. Marshall,* 832 A.2d 1254, 1262 (Del.Ch. 2003) ("The threat of an uninformed stockholder vote constitutes irreparable harm."); *Pure Resources,* 808 A.2d at 452 ("[I]rreparable injury is threatened when a stockholder might make a tender or voting decision on the basis of materially misleading or inadequate information.").

its version of relevant events. The parties shall settle the order in good faith so as to avoid any timing inequities to either Eisner or Upper Deck, and therefore to the Topps stockholders. The injunction will not permit Upper Deck any relief from its obligations not to misuse Topps's confidential information.

In reaching a remedy, I also take into account unsolicited correspondence I received from the defendants today at a time when this decision was being finalized for imminent issuance. That correspondence suggests that the Topps incumbent directors, facing the possibility of an injunction, have now begun to negotiate more earnestly with Upper Deck and to make more serious overtures. Regrettably, Topps did not consult with Upper Deck before sending in the correspondence, has not put off the Eisner Merger vote, and has not obtained Upper Deck's agreement that a delay in issuing this decision is in order. That leaves me in an uncomfortable place. Given the record as it existed as of mid-day, I conclude that an injunction of the kind I have outlined above remains in order. By its terms, that injunction will not prevent Topps from keeping the Standstill in place but if it chooses to do so, it will not be able to proceed with the Merger vote.

The other danger of an injunction of this kind is premised on a fear that stockholders will make an erroneous decision. In this regard, it is notable that nothing in this decision purports to compel the Topps board to enter a merger agreement with Upper Deck that it believes to be unduly conditional. What this decision does conclude is that, on this record, there is no reasonable basis for permitting the Topps board to deny its stockholders the chance to consider for themselves whether to prefer Upper Deck's higher-priced deal, taking into account its unique risks, over Eisner's lower-priced deal, which has its own risks.[31] If the Topps board sees the Upper Deck tender offer and believes it should not be accepted, it can tell the stockholders why. It can even consider the use of a rights plan to prevent the tender offer's procession, if it can square use of such a plan with its obligations under *Revlon* and *Unocal*. But it cannot at this point avoid an injunction on the unsubstantiated premise that the Topps stockholders will be unable, after the provision of full information, rationally to decide for themselves between two competing, non-coercive offers.[32]

Consistent with this reasoning, the vote on the Eisner Merger will also be enjoined until Topps issues corrective disclosures addressing the problems identified earlier in this decision.

## VI. *Conclusion*

For all these reasons, the moving parties' motion for a preliminary injunction is GRANTED. The parties shall present an implementing order no later than noon on June 18, 2007.

---

**31.** *See, e.g., Revlon,* 506 A.2d at 184 ("[W]hen bidders make relatively similar offers, or dissolution of the company becomes inevitable, the directors cannot fulfill their enhanced *Unocal* duties by playing favorites with the contending factions. Market forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity."); *see also Robert M. Bass Group, Inc. v. Evans,* 552 A.2d 1227, 1242 (Del.Ch.1988).

**32.** *See Chesapeake Corp. v. Shore,* 771 A.2d 293, 329 (Del.Ch.2000).